UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STACEY CRIMANS, Individually and on Behalf of All Others Similarly Situated, | : | No. 21-cv-2906 |
| | : | |
| | : | CLASS ACTION COMPLAINT |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| HEALTH & HOSPITAL CORPORATION OF MARION COUNTY d/b/a ESKENAZI HEALTH, | : | |
| | : | |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

Plaintiff Stacey Crimans ("Plaintiff"), individually and on behalf of all others similarly situated, through her undersigned counsel, alleges as follows against Defendant Health & Hospital Corporation of Marion County d/b/a Eskenazi Health ("Eskenazi" or "Defendant"), based upon personal knowledge as to herself, and, as to all other matters, upon information and belief, including her counsel's investigation.  Plaintiff believes additional evidentiary support exists for her allegations, given an opportunity for discovery.

## NATURE OF THE ACTION

1.     The cybersecurity of public hospitals and health care providers is of vital importance to Americans, including those who work for them and those who rely on the life-saving treatment that they provide.  Contrary to its promises and legal and regulatory obligations, and unbeknownst to Plaintiff and the Class (defined below), Eskenazi failed to provide proper cybersecurity for its patients and employees, including the protection of personally identifying information like their names, dates of birth, ages, addresses, telephone numbers, email addresses, medical record numbers, patient account numbers, diagnoses, clinical information, physician names, insurance information, prescription information, date(s) of service, driver's license numbers, passport numbers, face photos, Social Security numbers, and credit card information (collectively, "Personal and Medical Information").

2.     Eskenazi failed to timely notify Plaintiff and other Class members of the data breach.  While Eskenazi sent letters regarding the breach to Plaintiff and the Class on or about November 11, 2021, this was six months after the data breach began, and three months after Eskenazi became aware of the data breach.  The data breach was caused by Eskenazi's own systemic failures to implement and maintain reasonable and legally obligated security measures to protect the Personal and Medical Information of Plaintiff and the Class from unauthorized access, acquisition, destruction, use, modification, and disclosure.

3.     On behalf of herself and the Class, Plaintiff now seeks redress for Defendant's negligence and a for a declaration under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

## PARTIES

4.     Plaintiff Stacey Crimans is a natural person domiciled in Florida, and a member of the Class as defined below.  As a condition of her employment in the Fall of 2019, Eskenazi required Plaintiff to submit to a physical examination and submit her Personal and Medical Information by filling out detailed medical information forms.  At the time Eskenazi collected her Personal and Medical Information, Plaintiff was domiciled in Indiana.  Plaintiff's information was stored on Eskenazi's system in Indiana at all times material hereto.  Plaintiff received a letter dated November 11, 2021 from Eskenazi notifying her that cyber criminals accessed the following information relating to her: "name, date of birth, age, address, telephone number, email addresses, medical record number, patient account number, [medical] diagnosis, clinical information, physician name, insurance information, prescriptions, date(s) of service, driver's license number, passport number, face photos, Social Security number, and credit card information."  Following receipt of the letter from Eskenazi, Plaintiff spent time ensuring that her Personal and Medical Information was as safe as could be, notwithstanding the Data Breach.

5.     Defendant Eskenazi is a corporation organized under the laws of the State of Indiana with its headquarters located in Indianapolis, Indiana. As part of Defendant's business, Defendant collects substantial amounts of Personal and Medical Information.  The information Defendant collects qualifies as "Personal Information" under state data breach and information privacy acts, including the Indiana's security breach notification statute, Indiana Code art. 24-4.9. The Medical Information that Defendant collects qualifies as "Medical information" or "Protected Health Information" ("PHI") under the federal Health Information Portability and Accountability Act ("HIPAA"), and state medical record protection acts.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

7.      Venue is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

8.      As stated on its company website, Eskenazi is "one of America's largest essential health care systems," and "provides treatment and services through more than 1 million outpatient visits each year."[1]

### The Data Breach

9.      On or about November 11, 2021, Eskenazi sent a form letter to Plaintiff and over 1.5 million former and current patients, employees, and providers throughout the country informing them that "sophisticated cybercriminals had gained access to [Eskenazi's] networks on or about May 19, 2021, using a malicious internet protocol address" (the "Data Breach"). Notice Letter, Ex. A at 1.  The letter states that Eskenazi discovered that it had been breached on or about August 4, 2021, over three months prior to notifying Plaintiff and Class members of the Data Breach.  *Id.*

10.      The Notice Letter indicated that the information accessed by cyber criminals included "name, date of birth, age, address, telephone number, email addresses, medical record number, patient account number, diagnosis, clinical information, physician name, insurance

---

[1]      *About*, ESKENAZI HEALTH, https://www.eskenazihealth.edu/about (last visited Nov. 20, 2021).

information, prescriptions, date(s) of service, driver's license number, passport number, face photos, Social Security number, and credit card information." *Id.*

11.    Moreover, the Notice Letter stated that "data was stolen from our network by the cyber criminals and they released a portion of the data on the Internet, known as the Dark Web," which "included certain personal and health information of some patients and employees." *Id.*

12.    Eskenazi has publicly stated that it did not make a ransom payment to the cybercriminals.[2]

13.    Despite advising Plaintiff that her Personal and Medical Information was accessed by cyber criminals, but "has not been posted on the Dark Web at this time," Defendant nonetheless told Plaintiff and all other Class members that they should be vigilant in "detect[ing] possible misuse of [their] information," and "encourage you to activate the fraud detection tools available through Experian IdentityWorks" and to "monitor[] your personal information."  Notice Letter, Ex. A at 1-2.

14.    As a result of the Data Breach, Plaintiff's and Class members' Personal and Medical Information has been released into the public domain and published on the Dark Web. Consequently, Plaintiff and Class members have been forced to, and will continue to be forced to, spend substantial time protecting themselves from the continuing and imminent threats of fraud and identity theft.

15.    It is obvious that Defendant failed to adequately safeguard Plaintiffs and Class members' Personal and Medical Information, allowing the cyber criminals to access this wealth of

---

[2]    *Eskenazi Health Provides Notice to Patients and Employees of a Data Breach*, ESKENAZI HEALTH (Oct. 1, 2021), https://www.eskenazihealth.edu/news/update-on-eskenazi-health-cyber-incident.

priceless information for nearly many months, and then use it for another three months before Defendant warned the criminals' victims (Plaintiff and the Class), to be on the lookout.

16.    Defendant utterly failed to spend sufficient resources on monitoring its network and computer systems.

17.    Defendant had obligations created by HIPPA, reasonable industry standards, its own contracts with its patients and employees, common law, and its representations to Plaintiff and Class members, to keep their Personal and Medical Information confidential and to protect the information from unauthorized access.

18.    Plaintiff and Class members provided their Personal and Medical Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

19.    Indeed, as discussed below, Defendant promised Plaintiff and Class members that it would do just that.

### Defendant Expressly Promised to Protect Personal and Medical Information

20.    The Data Breach occurred despite Eskenazi's assurances and legal obligations that the Personal and Medical Information Plaintiff and other Class members entrusted to Eskenazi was secure.  For example, in its Notice of Privacy Practices ("NOPP")—effective September 23, 2013, and last revised in January 2021—Eskenazi represents that it is "committed to protecting medical

information about our patients."[3] Its NOPP also acknowledges that Eskenazi is required by law to "[m]ake sure that PHI [Protected Health Information] about you is kept private."[4]

21.     In its Privacy Policy & Terms, Eskenazi represents that it "places the highest priority on protecting the privacy of our patients and holds all patient information in strict confidence."[5]

22.     In its Patient Rights and Information Guide, Eskenazi assures patients that their "privacy is very important to us," and promises that patients will "[h]ave confidentiality and privacy regarding all aspects of [their] care and medical information."[6]

23.     Notwithstanding the foregoing assurances and promises, Eskenazi failed to protect the Personal and Medical Information of Plaintiff and other members of the Class from unauthorized access and/or exfiltration by cyber criminals.

**Defendant had an Obligation to Protect Personal and Medical Information under Federal and State Law and the Applicable Standard of Care**

24.     Defendant is an entity covered by HIPAA (45 C.F.R. §160.102). As such, it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"),

---

[3]     *Notice of Privacy Practices*, ESKENAZI HEALTH, https://www.eskenazihealth.edu/docs/default-source/policies/eskenazi-health-notice-of-privacy-practices-eng18p1--8-24-18.pdf?sfvrsn=2 (last visited Nov. 20, 2021).

[4]     *Id.*

[5]     *Eskenazi Health Privacy Policy & Terms*, ESKENAZI HEALTH, https://www.eskenazihealth.edu/docs/default-source/policies/eskenazi-health-privacy-policy.pdf?sfvrsn=2 (last visited Nov. 20, 2021).

[6]     *Patient Rights and Information Guide*, ESKENAZI HEALTH, https://www.eskenazihealth.edu/docs/default-source/policies/patient-rights.pdf?Status=Temp&amp;sfvrsn=dc39ae9d_4 (last visited Nov. 20, 2021).

and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

25.     HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

26.     HIPAA's Security Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is health or transferred in electronic form.

27.     HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. §164.302.

28.     "Electronic protected health information" is "individually identifiable health information . . . that is (i) Transmitted by electronic media; (ii) maintained in electronic media . . . ." 45 C.F.R. §160.103.

29.     HIPAA's Security Rule requires Defendant to do the following:

(a)     Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

(b)     Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

(c)     Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

(d)     Ensure compliance by its workforce.

30. HIPAA also required Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. §164.306(e).

31. HIPAA also required Defendant to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

32. The HIPAA Breach Notification Rule, 45 CFR §§164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[7]

33. Defendant was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

34. In addition to their obligations under federal and state laws, Defendant owed a duty to Plaintiff and the Class whose Personal and Medical Information was entrusted to Defendant to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal and Medical Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and the Class

---

[7] Breach Notification Rule, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Nov. 22, 2021).

to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected their Personal and Medical Information.

35.    Defendant owed a duty to Plaintiff and the Class whose Personal and Medical Information was entrusted to Defendant to design, maintain, and test its computer system to ensure that the Personal and Medical Information in Defendant's possession was adequately secured and protected.

36.    Defendant owed a duty to Plaintiff and the Class whose Personal and Medical Information was entrusted to Defendant to create and implement reasonable data security practices and procedures to protect the Personal and Medical Information in their possession, including adequately training its employees and others who accessed Personal Information within its computer systems on how to adequately protect Personal and Medical Information.

37.    Defendant owed a duty to Plaintiff and the Class whose Personal and Medical Information was entrusted to Defendant to implement processes that would detect a breach on its data security systems in a timely manner.

38.    Defendant owed a duty to Plaintiff and the Class whose Personal and Medical Information was entrusted to Defendant to act upon data security warnings and alerts in a timely fashion.

39.    Defendant owed a duty to Plaintiff and the Class whose Personal and Medical Information was entrusted to Defendant to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Personal and Medical Information from theft because such an inadequacy would be a material fact in the decision to entrust Personal and Medical Information with Defendant.

40.    Defendant owed a duty to Plaintiff and the Class whose Personal and Medical Information was entrusted to Defendant to disclose in a timely and accurate manner when data breaches occurred.

41.    Defendant owed a duty of care to Plaintiff and the Class because they were foreseeable and probable victims of any inadequate data security practices.

**Defendant Was on Notice of Cyber Attack Threats and the Inadequacy of Its Data Security**

42.    Defendant was on notice that companies in the healthcare industry were targets for cyberattacks.

43.    Defendant was on notice that the FBI has been concerned about data security in the healthcare industry.  In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[8]

44.    The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue.  AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack.  Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[9]

---

[8]    Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, Reuters (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[9]    Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomeware-attacks-shut-down-clinics-hospitals.

45.    As implied by the above quote from the AMA, stolen Personal and Medical Information can be used to interrupt important medical services themselves.

46.    Defendant was on notice that the federal government has been concerned about healthcare company data encryption.  Defendant knew it kept protected health information in its computer network and yet apparently did not encrypt such information.

47.    The United States Department of Health and Human Services' ("DHHS") Office for Civil Rights urges the use of encryption of data containing sensitive personal information.  As long ago as 2014, the DHHS fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information.  In announcing the fines, Susan McAndrew, the DHHS's Office for Civil Rights' deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[10]

48.    As a covered entity or business associate under HIPAA, Defendant should have known about its network's weakness and sought better protection for the Personal and Medical Information accumulating in its computer systems.

**A Data Breach like Eskenazi's Results in Debilitating Losses to Victims**

49.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[11]  Cyber criminals can leverage Plaintiff's and Class members' Personal and Medical Information that was stolen in the Data Breach to commit thousands-indeed, millions-of

---

[10]    *Stolen laptops lead to important HIPAA settlements*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[11]    *Facts + Statistics: Identity theft and cybercrime*, INS. INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Nov. 22, 2021) (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

additional crimes, including opening new financial accounts in victims' names, taking out loans in victims' names, using victims' names to obtain medical services and government benefits, using victims' Personal Information to file fraudulent tax returns, using victims' health insurance information to rack up massive medical debts in their names, using victims' health information to target them in phishing and hacking intrusions based on their individual health needs, using victims' information to obtain government benefits, obtaining driver's licenses in victims' names but with another person's photograph, and giving false information to police during an arrest. Even worse, Plaintiff and the Class could be arrested for crimes identity thieves have committed.

50.     Personal and Medical Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black-market for years.

51.     This was a financially motivated data breach, as the likely reason the cyber criminals stole Plaintiff's and the Class members' Personal and Medical Information from Defendant, was to engage in the kinds of criminal activity described above in paragraph 49, which will result, and has already begun to, in devastating financial and personal losses to victims.

52.     This is not just speculative. As the FTC has reported, if hackers get access to Personal and Medical Information, they will use it.[12]

53.     Hackers may not use the information right away.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies

---

[12]    Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017),    https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

54.    For instance, with a stolen Social Security number, which is part of the Personal and Medical Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[14]  Identity thieves can also use the information stolen from victims to qualify for expensive medical care and leave them and their contracted health insurers on the hook for massive medical bills.

55.    Medical identity theft is one of the most common, most expensive, and most difficult to prevent forms of identity theft.  According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more "than identity thefts involving banking and finance, the government and the military, or education."[15]

56.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum.[16]  "Victims often experience financial repercussions and worse yet, they frequently

---

[13]   *Personal Information:  Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited;  However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/assets/gao-07-737.pdf.

[14]   *See, e.g.*, Christine DiGangi, *What Can You Do with a Stolen Social Security Number?*, CREDIT.COM (June 29, 2020), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[15]   Michael Ollove, *The Rise Of Medical Identity Theft In Healthcare*, KAISER HEALTH NEWS (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

[16]   *Id.*

discover erroneous information has been added to their personal medical files due to the thief's activities."[17]

57.    As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place.  Credit cards can be, say, five dollars or more where PHI can go from $20 say up to—we've seen $60 or $70 [(referring to prices on dark web marketplaces)]."[18]  A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market.[19]

58.    If, moreover, the cyber criminals also manage to steal financial information, credit and debit card numbers, health insurance information, driver's license and passport numbers—as they did here—there is no limit to the amount of fraud that Defendant has exposed Plaintiff and the Class to.

59.    A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[20]  Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while

---

[17]    *Id.*

[18]    *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idx.us/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[19]    *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30, 2014), https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

[20]    *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[21]

60.    As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[22]

61.    The danger of identity theft is compounded when a minor's Personal and Medical Information is compromised because minors typically have no credit reports to monitor.  Thus, it can be difficult to monitor because a minor cannot simply place an alert on their credit report or "freeze" their credit report when no credit report exists.

62.    Defendant's offer of one year of identity monitoring to Plaintiff and the Class is woefully inadequate.  While some harm has begun already, the worst may be yet to come.  There may be a time lag between when harm occurs versus when it is discovered, and also between when Personal and Medical Information is stolen and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's Personal and Medical Information)—it does not prevent identity theft.[23]  This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

63.    As a direct and proximate result of the Data Breach, Plaintiff and the Class have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and

---

[21]    *Id.*; *see also* Brian O'Connor, *Healthcare Data Breach: What to Know About Them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[22]    *Guide for Assisting Identity Theft Victims*, FED. TRADE COMM'N, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

[23]    *See, e.g.*, Kayleigh Kulp, *Credit monitoring services may not be worth the cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

identity theft. Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

64.    Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

(a)    Trespass, damage to, and theft of their personal property including Personal and Medical Information;

(b)    Improper disclosure of their Personal and Medical Information;

(c)    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal and Medical Information being placed in the hands of criminals and having been already misused;

(d)    The imminent and certainly impending risk of having their confidential medical information used against them by spam callers to defraud them;

(e)    Damages flowing from Defendant untimely and inadequate notification of the Data Breach;

(f)    Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Personal and Medical Information and that fraudsters have already used that information to initiate spam calls to members of the Class;

(g)    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

(h)    Ascertainable losses in the form of deprivation of the value of Personal and Medical Information for which there is a well-established and quantifiable national and international market;

(i)    The loss of use of and access to their credit, accounts, and/or funds;

(j)    Damage to their credit due to fraudulent use of their Personal and Medical Information; and

(k)    Increased cost of borrowing, insurance, deposits and other items which are adversely affected by a reduced credit score.

65.    Moreover, Plaintiff and Class members have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards.

66.    Defendant itself acknowledged the harm caused by the Data Breach because it offered Plaintiff and Class members twelve months of identity theft repair and monitoring services and, as alleged above, has told Plaintiff and the Class to monitor their Personal and Medical Information and protect themselves from identity theft and fraud.

## CLASS ACTION ALLEGATIONS

67.    This action satisfies the prerequisites for maintenance as a class action provided in Fed. R. Civ. P. 23(a), as set forth below.

68.    *Class Definition.*    Plaintiff brings this action individually and on behalf of the following Class of similarly situated persons of which Plaintiff is a member:

All natural persons domiciled in the United States or its territories to whom Eskenazi Health addressed a letter dated on or about November 11, 2021, informing them of a data breach involving the disclosure of their Personal and Medical Information.

69.    Excluded from the Class is Defendant and any of its respective officers, directors, or employees, the presiding judge, Class counsel and members of their immediate families, and persons or entities who timely and properly exclude themselves from the Class.

70.    *Numerosity.*    The members of the Class are so numerous and geographically dispersed throughout the United States such that joinder of all members is impracticable.  Eskenazi has admitted that over 1.5 million individuals across the country were affected by the Data Breach.

71.    *Commonality.*    There are questions of law or fact common to the Class including, inter alia, the following:

(a)    Whether Eskenazi failed to use reasonable care and reasonable methods to secure and safeguard Plaintiff's and the other Class members' Personal and Medical Information;

(b)    Whether Eskenazi properly implemented its purported security measures to protect Plaintiff's and the other Class members' Personal and Medical Information from unauthorized capture, dissemination, and misuse;

(c)    Whether Eskenazi took reasonable measures to determine the extent of the Data Breach after it first learned of the same;

(d)    Whether Eskenazi willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the other Class members' Personal and Medical Information;

(e)    Whether Eskenazi was otherwise negligent in failing to properly secure and protect Plaintiff's and the other Class members' Personal and Medical Information;

(f)    Whether Plaintiff and the members of the Class are entitled to their damages and the appropriate measure thereof; and

(g)    Whether equitable or injunctive or declaratory relief is appropriate.

72.    *Typicality.*  The claims of Plaintiff are typical of the claims of the Class alleged herein.  Plaintiff and other members of the Class are all persons to whom Eskenazi addressed a letter dated on or about November 11, 2021, informing them of a data breach involving the disclosure of their Personal and Medical Information.  Plaintiff is advancing the same claims for damages and legal theories on behalf of herself and all absent Class members herein.

73.    *Adequacy.*  Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are competent and experienced in the prosecution of complex and class action litigation.  The interests of Plaintiff are aligned with, and not antagonistic to, those of the Class.

74.    *Fed. R. Civ. P. 23(b)(2) Requirements.*  The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist, as Defendant has acted or has refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

75.    Defendant's actions are generally applicable to the Class as a whole, and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

76.    Defendant's uniform common course of conduct alleged herein makes declaratory relief with respect to the Class as a whole appropriate.

77.    *Fed. R. Civ. P. 23(b)(3) Requirements.*  This case satisfies the prerequisites of Fed. R. Civ. P. 23(b)(3).  The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.

78.    The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation,

especially in view of the relatively modest amount of monetary, injunctive, and equitable relief at issue for individual Class members.

79.    This action will be prosecuted in a fashion to ensure the Court's able management of this case as a class action on behalf of the Class.

80.    *Fed. R. Civ. P. 23(c)(4).*  Particular issues are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the claims present particular, common issues, the resolution of which would materially advance the resolution of this matter and the parties' interests therein. Such particular issues include, but are not limited to, whether Defendant owed a duty to Plaintiff and the Class to adequately secure their Personal and Medical Information, and whether Defendant breached that duty, among others.

## CHOICE OF LAW FOR NATIONWIDE CLAIMS

81.    The State of Indiana has a significant interest in regulating the conduct of businesses operating within its borders.  Indiana seeks to protect the rights and interests of all Indiana residents and citizens of the United States against a company headquartered and doing business in Indiana.  Indiana has a greater interest in the nationwide claims of Plaintiff and members of the Class than any other state, and is most intimately concerned with the claims and outcome of this litigation.

82.    The corporate headquarters of Eskenazi, located in Indianapolis, Indiana, is the "nerve center" of its business activities – the place where its high-level officers direct, control, and coordinate the company's activities, including its data security functions and major policy, financial, and legal decisions.

83.    Defendant's response to the Data Breach at issue here, and corporate decisions surrounding such response, were made from and in Indiana.

84.     Defendant's breaches of duty to Plaintiff and Class members emanated from Indiana.

85.     Application of Indiana law to the Class with respect to Plaintiff's and Class members' claims is neither arbitrary nor fundamentally unfair because Indiana has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiff and the Class.

86.     Under Indiana's choice of law principles, which are applicable to this action, the common law of Indiana applies to the nationwide common law claims of all Class members. Additionally, given Indiana's significant interest in regulating the conduct of businesses operating within its borders, and that Defendant accepted and maintained the Personal and Medical Information of all Class members in Indiana, including Plaintiff, Indiana law may be applied to non-resident Class members as against this resident-Defendant.

87.     Indiana law also applies to the claims of Plaintiff and the Class under the doctrine of *lex loci delicti* because the tort Defendant committed – negligence and negligence per se – occurred entirely in Indiana with respect to Plaintiff and all Class members.

## COUNT I
### (Negligence)

88.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 87, *supra*, as though fully stated herein.

89.     Eskenazi owed numerous affirmative duties to Plaintiff and the other members of the Class.  These duties include the duty:

(a)     to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Personal and Medical Information in its possession, custody, or control;

(b)     to protect the Personal and Medical Information in its possession, custody, or control using reasonable and adequate security procedures that are compliant with industry-

standard practices and the practices and certifications represented on its website which it voluntarily undertook duties to implement; and

(c)    to implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly and sufficiently notifying Plaintiff and the other members of the Class of the Data Breach described herein.

90.    Eskenazi, as one of America's largest essential health care systems, knew or should have known the risks of collecting and storing Personal and Medical Information, including health and health insurance claims information, and the importance of maintaining secure systems. Eskenazi knew of the many breaches that targeted other companies in the same sector in the years preceding the data breach.

91.    Given the nature of Eskenazi's business, the sensitivity and value of the Personal and Medical Information and other data it maintains, and the resources at its disposal, Eskenazi should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

92.    Eskenazi knew or should have known that its systems did not adequately safeguard Plaintiff's and the other Class members' Personal and Medical Information.

93.    Eskenazi breached the duties it owed to Plaintiff and Class members by, *inter alia*,

(a)    failing to implement adequate security systems, protocols, and practices sufficient to protect Personal and Medical Information and thereby creating a foreseeable, unreasonable risk of harm;

(b)    failing to comply with the minimum industry data security standards and its own assurances of superior data security standards;

(c)    negligently performing voluntary undertakings to secure and protect the Personal and Medical Information it solicited and maintained; and

(d)    failing to timely and sufficiently discover and disclose to Plaintiff and the Class that their Personal and Medical Information had been compromised.

94.    But for Eskenazi's breach of the duties it owed to Plaintiff and the other Class members, their Personal and Medical Information would not have been compromised.

95.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Eskenazi's negligence.  Plaintiff and the other Class members have suffered actual damages including improper disclosure of their Personal and Medical Information, deprivation of value of their Personal and Medical Information, lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft that resulted and continues to face them.

96.    Plaintiff's and the other Class members' injuries were proximately caused by Defendant's breach of its duties enumerated above, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is warranted.

## COUNT II
### (Negligence *Per Se*)

97.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 87, *supra*, as though fully stated herein.

98.    Defendant is an entity covered by HIPAA (45 C.F.R. §160.102) and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164. Subparts A and C.

99.    HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45

C.F.R. §164.530(c)(1).  HIPAA also requires Defendant to obtain satisfactory assurances that its business associates would appropriately safeguard the protected health information it receives or creates on behalf of the Defendant.  45 C.F.R. §§164.502(e), 164.504(e), 164.532(d) and (e).  The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

100.    HIPAA further requires Defendant to disclose the unauthorized access and theft of the Personal and Medical Information to Plaintiff and the Class members "without unreasonable delay" so that Plaintiff and Class members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal and Medical Information.  *See* 45 C.F.R. §§164.404, 406, 410.

101.    Defendant violated HIPAA by failing to reasonably protect Plaintiff and Class members' Personal and Medical Information, as described herein.

102.    Defendant's violations of HIPAA constitute negligence per se.

103.    Plaintiff and Class members are within the class of persons that HIPAA was intended to protect.

104.    The harm that occurred as a result of the Data Breach at issue herein is the type of harm HIPAA was intended to guard against.

105.    Additionally, Section 5 of the FTC Act (15 U.S.C. §45) prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Personal and Medical Information. 15 U.S.C. §45(a)(1).

106.    The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

107.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Personal and Medical Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Personal and Medical Information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving companies like Eskenazi, including, specifically, the immense damages that would result to Plaintiff and Class members.

108.     Defendant's violations of Section 5 of the FTC Act also constitute negligence per se.

109.     Plaintiff and Class members are within the class of persons that the FTC Act was intended to protect.

110.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

111.     As a direct and proximate result of Defendant's negligence per se under HIPAA and the FTC Act, Plaintiff and the Class have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

**COUNT III**
**(Declaratory Judgment)**

112.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 87, *supra*, as though fully stated herein.

113.     This count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

114.     As previously alleged, Defendant owed duties of care to Plaintiff and Class members that require them to adequately secure Personal and Medical Information.

115.    Defendant still possesses Personal and Medical Information pertaining to Plaintiff and Class members.

116.    Defendant has made no announcement or notification that they have remedied the vulnerabilities in its practices and policies regarding ensuring the data security of victims' Personal and Medical Information.

117.    Accordingly, Defendant has not satisfied its legal duties to Plaintiff and Class members.  In fact, now that Defendant's lax approach towards data security has become public, the Personal and Medical Information in its possession is more vulnerable than it was prior to announcement of the Data Breach.

118.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's duties of care to provide data security measures to Plaintiff and Class members, including the fact that Class members' Personal and Medical Information is available for sale on the Dark Web.

119.    Plaintiff, therefore, seeks a declaration that (a) Defendant's existing data security measures do not comply with its duties of care, and (b) in order to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

(a)    Modifying its practices and policies to ensure the protection of Personal and Medical Information it collects, including engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and to promptly correct any problems or issues detected by such third-party security auditors;

(b)    Modifying its practices and policies to ensure the engagement of third-party security auditors and internal personnel to run automated security monitoring;

(c)     Modifying its practices and policies to ensure that Defendant audits, tests, and trains security personnel regarding any new or modified procedures;

(d)     Modifying its practices and policies to ensure the business associates to which it provides consumers' Personal and Medical Information segment Personal and Medical Information by, among other things, creating firewalls and access controls so that if one area of a system is compromised, hackers cannot gain access to other portions of the systems;

(e)     Modifying its practices and policies to ensure Personal and Medical Information not necessary for the provision of services is purged, deleted, and destroyed;

(f)     Routinely and continually conduct internal training and education of internal data security personnel; and

(g)     Educating its customers about the threats they face as a result of the loss of their financial and Personal and Medical Information to third parties, as well as the steps they must take to protect themselves.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, appointing Plaintiff to serve as a class representative, and appointing her counsel as Class Counsel;

B.     Declaring that Defendant is liable under one or more of the above causes of action;

C.     Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Awarding nominal damages in favor of Plaintiff and the other Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

E.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' costs and expenses; and

F.      Awarding such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate causes of action and issues raised herein.

Dated:  November 23, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
BRADLEY M. BEALL*


                _/s/ Stuart A. Davidson_
              STUART A. DAVIDSON

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
bbeall@rgrdlaw.com

PAOLO C. MEIRELES*
SHAVITZ LAW GROUP, P.A.
951 Yamato Rd, Suite 285
Boca Raton, FL  33431
Telephone:  561/447-8888
pmeireles@shavitzlaw.com

Attorneys for Plaintiff and the Class

* _pro hac vice_ forthcoming